

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 14, 2022

BY CM/ECF

Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

If Defendant wishes to respond in writing to the Government's sentencing submission, particularly to its allegations concerning his use of the proceeds received from the tender offer and his other post-arrest financial activities, he may submit a letter in response by October 20, 2022.

SO ORDERED
Date: October 15, 2022
New York, New York

_____
JOHN P. CRONAN
United States District Judge

Re:   *United States v. Adam Rogas*, 20 Cr. 539 (JPC)

Dear Judge Cronan:

The Government respectfully submits this letter in connection with the sentencing of the defendant, Adam Rogas, which is scheduled for October 21, 2022 at 9:30 am, and in response to the defendant's sentencing submission dated October 7, 2022 ("Def. Mem."). The parties agree that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range applicable to the defendant is 121 to 151 months' imprisonment, and the Probation Department agrees with that calculation, as set forth in the Presentence Report ("PSR"). For the reasons set forth below, the Government respectfully submits that a sentence at the low end of the applicable Guidelines range is appropriate in this case.

## The Offense Conduct

NS8, Inc. ("NS8") was a cyberfraud prevention company that developed and sold electronic tools to help online vendors assess the fraud risks of customer transactions. NS8 was founded in or about 2016, and was based in Las Vegas, Nevada. NS8's revenues were generated from its customers (online vendors and e-commerce websites) paying subscription fees to NS8 on a periodic basis. Until his resignation on or about September 1, 2020, Rogas served as a founder and the Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and a member of the Board of Directors of NS8, and was primarily responsible for the company's fundraising activity. Rogas exercised control over the books and records of NS8, and also maintained control over the bank accounts where NS8's revenue was purportedly deposited. Dkt. 1 ¶¶ 6-7; Dkt. 7 at ¶¶ 1-2.

From at least in or about 2019 through in or about September 2020, Rogas developed and executed a scheme to defraud NS8's investors out of approximately $123 million by falsifying nearly all of NS8's purported customers, revenue, and assets. As part of this scheme, Rogas used

falsified bank statements to cause material misrepresentations to be made to investors regarding NS8's assets and revenue, including by showing tens of millions of dollars in assets and revenue that did not exist.  Through those material misrepresentations, Rogas enticed those investors to purchase securities in two fundraising rounds that provided NS8 with approximately $123 million in funds.  Rogas subsequently engineered a tender offer during which he tendered NS8 shares he owned and otherwise controlled, obtaining approximately $17.5 million as a result. Dkt. 1 ¶ 6; Dkt. 7 at ¶ 3.

For at least two years, Rogas perpetrated this scheme by creating multiple fake documents, including spreadsheets that purported to show numerous customers who were paying for NS8's services and bank statements that Rogas had doctored in order to artificially inflate the company's revenue.  (PSR ¶¶ 19-20).  Rogas then sought to raise money in fundraising rounds in the fall of 2019 and the spring of 2020, and he defrauded the investors in those fundraising rounds by (a) providing them with financial statements that he had caused to be materially misleading; and (b) providing fake documents to an audit firm that conducted due diligence and tested NS8's financial statements.  (PSR ¶¶ 24-36).

Rogas also deceived an employee of that audit firm who was conducting a physical site visit at NS8's Las Vegas offices and who had been directed to have someone from NS8 log into the online portal for each NS8 bank account, display the current account balance, and download monthly bank statements for fiscal year 2019.  (PSR ¶ 37).  Rogas met with that audit firm employee in Rogas's office, and made it appear that he was accessing the company's bank account that held revenue from customers.  (PSR ¶¶ 38-39).  In fact, he was displaying to the auditor the fake bank account statements that fraudulently inflated NS8's revenue and assets.  (PSR ¶ 39).

As noted, Rogas personally benefited from this fraud by causing NS8 to conduct a tender offer with investor funds, and he personally tendered shares and received $17.5 million of investor money.  (PSR ¶ 42).

**Procedural History**

On or about September 17, 2020, Rogas was arrested on a criminal complaint (the "Complaint").  Dkt. 1.  A grand jury in this District then returned an indictment against Rogas on or about October 13, 2020 (the "Indictment").  Dkt. 7.  The Complaint and Indictment each allege three counts against Rogas relating to the same long-running scheme to defraud investors: securities fraud (Count One); fraud in the offer or sale of securities (Count Two); and wire fraud (Count Three).

On March 16, 2022, Rogas pleaded guilty to Count One of the Indictment.

The Government agrees with the U.S. Probation Office on the Guidelines calculation in this case, which is also consistent with the stipulated Guidelines range in the plea agreement between the parties.  In particular, the offense level is 32 calculated as follows: a base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1), a 24-level increase pursuant to U.S.S.G.

§ 2B1.1(b)(1)(M) because the loss from the offense was more than $65 million but not more than $150 million; a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved ten or more victims; a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means; and a three-point reduction for the defendant's acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b). (PSR ¶¶ 7, 53-65). The defendant has no known criminal history. Accordingly, the recommended Guidelines range is 121 to 151 months of imprisonment. (PSR ¶ 97). Through its supplement to the PSR, the Probation Office has recommended a sentence of 60 months' imprisonment. (PSR at 24). The defendant requests a sentence of 24 months' imprisonment. (Def. Mem. at 1).

### A Sentence at the Low End of the Applicable Guidelines Range Is Appropriate

A sentencing judge must begin the process of imposing sentence by calculating the applicable Guidelines range. *See United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable."). After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to meet the sentencing goals set forth in Section 3553(a) if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." 18 U.S.C. § 3553(b)(1). The sentencing goals identified in Section 3553(a) include, among other things, promoting respect for the law, providing just punishment, and deterring criminal conduct. *See United States v. Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).[1] Here, a sentence at the low ends of the Guidelines range (121 to 151 months) would be sufficient but not greater than necessary to accomplish the goals of sentencing.

#### 1. Rogas's Fraud Was Brazen, Calculated, and Long-Running

While the defendant characterizes his crime as an "uncharacteristic mistake in judgment," (Def. Mem. at 8), the record reveals that his conduct was brazen, calculated, and lasted over a period of years. Rogas created a host of fake documents—spreadsheets that listed scores of fictitious customers, bank records doctored month after month and then passed along as if they

---

[1] The full set of factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, namely the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

were authentic—in order to fool anyone who came looking.  He used those fake documents to fool others at NS8, who believed that the company was wildly successful and was growing like a Silicon Valley unicorn.  He used those fake documents to attract employees to come work for NS8 (employees who would later be laid off after Rogas's fraud was exposed and the company was forced into bankruptcy).  He ultimately used those fake documents to fool investors and auditors.

This was not a passing "mistake."  Rogas created these fake documents again and again over the course of years.  One example, cited in the Complaint, underscores the level of intentionality involved in his criminal conduct.  Investors hired an audit firm to conduct due diligence in the spring of 2020 prior to making an investment in NS8.  A junior auditor was dispatched to NS8's offices with the mandate to observe an NS8 employee logging into the company's bank accounts, and to confirm the bank balances on a computer screen.  Rogas orchestrated a charade where he made it look like he was logging into the company's bank account, when in fact he displayed doctored bank records.  The level of pre-planning and calculated deceit involved in this one incident is characteristic of how Rogas carried out this years-long scheme.  Such conduct merits a serious sentence, to reflect the seriousness of the offense and to provide just punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).

### A. Rogas Was Motivated by Greed

Rogas obtained extravagant personal benefits from his fraud, in a manner that suggests his motivation to commit this crime was greed.  As noted above, he caused NS8 to conduct a tender offer through which he profited by $17.5 million.  After using approximately $7.5 million to repay a loan, he used substantial portions of the remainder to go on a spending spree, including purchasing a luxury home in the Dominican Republic for $3 million.

Rogas's family and friends continued to enjoy the extravagant benefits of his fraud even after his arrest.  As noted below, Rogas spent money (in violation of a freeze order issued by the Honorable Paul A. Crotty) to purchase numerous luxury items.  In addition, in July 2021 Rogas's wife and children, along with a number of friends,[2] traveled by private jet from Las Vegas to the Dominican Republic for a vacation, presumably spent at the luxury estate that Rogas had purchased with fraud proceeds.

Rogas claims that he "attempted, through counsel, to contact the company management to offer . . . the return of money and stock, in an effort to keep the company viable and protect the shareholder value and protect the hundreds of jobs that they had created."  (PSR ¶ 51).  If this had been a genuine offer, Rogas would long ago have "return[ed] money" to NS8.  He would have sold the $3 million vacation property he purchased in the Dominican Republic with fraud proceeds and returned that money to NS8 and his victims.  He would have collected the

---

[2] One of those friends appears to be the individual who wrote a letter of support on behalf of Rogas in which the friend wrote that "[o]ne thing in particular that has struck me about Adam is his extreme generosity of time and money when it comes to friends and charitable organizations." (Def. Mem. Exhibit 4 at 1).  It is not laudable, of course, for Rogas to have demonstrated "extreme generosity" with money that he stole from NS8's investors.

additional millions of dollars he received in the tender offer and returned it to victims. Indeed, to this day he has not repaid *any* of his fraudulent proceeds. He should not be given credit for an empty promise to return money and "keep [NS8] viable."

One theme in the letters written in support of the defendant is that his crimes were not committed for personal gain. The facts in this case tell a different story. The defendant engineered a tender offer using the proceeds of his fraudulent conduct, and that tender offer enriched not just himself ($17.5 million) but also some of his close friends who were co-founders and early employees of NS8. Perhaps recognizing that his fraud would not last forever, he took affirmative steps to shield his fraudulent proceeds. In addition to purchasing a multimillion dollars luxury residence in a foreign country, shortly after Rogas received the proceeds from the tender offer, he moved $1 million to his wife's name in a series of transactions that appear to be designed to conceal that their source was Rogas's fraud.

Shortly after the tender offer, Rogas transferred $1 million that he received through multiple bank accounts (including accounts of two different companies he controlled) and a joint bank account he held with his wife in July and August 2020, and then had that $1 million converted into cashier's checks in the name of his wife (who created a brand new bank account in her name only and then deposited that $1 million into the bank account on the same day, in early September 2020). This conduct evinces an intent to shield his fraudulent proceeds, and is further proof that Rogas was motivated to commit these crimes by greed.

### B. Rogas Has Continued to Engage in Financial Improprieties

Based on the Government's continuing investigation, it also appears that Rogas has not learned his lesson from his arrest and prosecution in this case. On the same day the instant indictment was unsealed, the United States Securities and Exchange Commission filed an action, *SEC v. Rogas, et al.*, 20 Civ. 7628 (PAC) (the "SEC Case"), which was assigned to Judge Crotty. On September 24, 2020, Judge Crotty entered a consent order freezing approximately $35 million "of assets, funds, or other property of Defendant Adam Rogas wherever located or by whomever held, and whether acquired before or after institution of this action." SEC Case Dkt. No. 20, 21. The SEC served the asset freeze order on Rogas through counsel on September 18, 2020. On February 23, 2021 Judge Crotty subsequently stayed the SEC Case upon motion of the Government.

In or about April 2021, Rogas transferred approximately $1.7 million of his funds from an account held in the name of the company PhutureCorp, and used that money to fund an account at a different financial institution (the "New Rogas Account"). That approximately $1.7 million was fraud proceeds, and those transfers appear to have violated Judge Crotty's freeze order.

Rogas spent substantial amounts of the funds from the New Rogas Account on what appear to be, from records received from the financial institution that maintained the New Rogas Account, luxury items, including the following:

- Approximately $100,000 spent on a swimming pool
- Approximately $16,000 sent to the company that owns the Las Vegas National Hockey League team, presumably for hockey tickets
- Over $11,000 spent at Restoration Hardware
- Over $10,000 sent to event ticket companies
- $9,450 spent on tickets for events at the University of Las Vegas
- Approximately $4,000 spent for a garden fountain
- Over $10,000 spent at Apple stores
- Substantial sums spent at restaurants, including approximately $1,000 spent on one day at a Japanese restaurant

Rogas also transferred approximately $1.2 million from the New Rogas Account to an account in his own name on a cryptocurrency exchange.

Again, each of these transactions—which were designed to enrich Rogas, his family, and his friends—violated Judge Crotty's freeze order.

On January 7, 2022, the SEC and Rogas filed a letter informing Judge Crotty that Rogas had "violated the asset freeze in this case by spending or transferring approximately $1.7 million without the permission of this Court," including transferring nearly $1.2 million "into crypto currency investments," and "request[ed] that the Court order [Mr.] Rogas to deposit the remaining funds to the registry of the Court." SEC Case Dkt. No. 53; *see also* Dkt. No. 55 (granting motion).

With respect to the $1.2 million that Rogas transferred to a cryptocurrency exchange, the Government understands from the SEC that Rogas contends that many of his cryptocurrency assets are held in NFTs (or "non-fungible tokens"). The Government's understanding is that, to this day, Rogas has transferred to the registry of the Court little if any of the $1.7 million that was the subject of the joint SEC-Rogas letter to Judge Crotty.

This post-arrest conduct puts the lie to Rogas's claim that his crime was an isolated "mistake."

### 2. Rogas's Fraud Had a Demonstrable and Significant Impact on Victims

Attached hereto are two victim impact statements, one from the Plan Trust of Cyber Litigation Inc. (the legal entity in which all remaining claims, rights, and interests of NS8 are vested) (Ex. A), and one from AXA Venture Partners, one of the victim-investors (Ex. B). Those letters provide the Court with the victims' perspective on this fraud. In particular, the statement from the Plan Trust of Cyber Litigation Inc. describes harms that Rogas caused and that may not be directly evident from the charging documents or the PSR. For one, Rogas's lies and fraudulent conduct caused NS8 to waste enormous amounts of corporate funds. (Ex. A at 2). This included hiring nearly 100 employees to deal with NS8's purported paying customers. The lion's share of those "paying customers" had been invented by Rogas, and NS8 did not have need to hire those individuals. All of the money and all of the resources that Rogas directed towards perpetuating the customer myth he created could instead have gone towards building a better product that would capture actual, not fictitious, sales. Second, Rogas created fictional work for the additional (and unnecessary) sales staff he had hired, which further concealed his fraud.

Third, as NS8 points out, Rogas's conduct put the company into a dire financial condition from which it was unable to recover. It ultimately had to undergo a rapid restructuring and laid off most of its workforce. Since the discovery of this fraud, NS8 has incurred millions of dollars of expenses, including not only responding to the Government's requests and requests of other government agencies such as the SEC, but also the massive expenses of a bankruptcy proceeding.

This was not a victimless crime. While Rogas suggests in his sentencing submission that his "motivation was to keep his employees *employed*, as he had every confidence that the company he built would be successful, with his investors rewarded and customers satisfied," (Def. Mem. at 8), the reality is that when *he* walked away from NS8, he did so with a Dominican vacation home, access to private jets, and other luxury items purchased with fraud proceeds, while his former employees were laid off and were left with nothing. The sentence in this case should recognize the extraordinary harm caused by Rogas's conduct—not just to NS8's investors, but also the company itself and its employees.

### 3. Rogas's Personal History and Position of Privilege

Rogas's crime is all the more troubling because he has led an extraordinarily privileged life. He was raised in a loving and supportive environment, had the opportunity to attend college, and for over a decade prior to the instant offense had lucrative jobs, (PSR ¶¶ 87-90), many of which were at companies that he founded. As demonstrated by the letters submitted along with his sentencing submission, Rogas has a stable and supportive network of friends and colleagues surrounding him. In short, Rogas could have lived an amply comfortable life without resorting to fraud. That fact is relevant to sentencing for at least two reasons. First, it demonstrates the degree to which greed motivated Rogas's actions, as opposed to financial desperation or some other motive. Second, it is important for the public to see that defendants of privilege are held to account for serious criminal offenses, in order to promote respect for the

criminal justice system. Although the offense conduct here would be egregious regardless of the defendant's background, Rogas's conduct is all the more shocking because of his position of privilege. For a defendant with so much support and success—unlike many disadvantaged defendants that come before the Court—to nevertheless choose to commit the charged offenses reflects an uncommon brazenness and greed.

Rogas seeks a 24-month sentence,[3] but such a sentence would send the wrong message to both the defendant and the public about the consequences for individuals seeking to access capital for their corporations. Individuals who commit fraud often do so on the basis of a cost-benefit analysis—a belief that the likelihood of financial gain outweighs risk of being caught and punished. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). In this context, a significant deterrent message to the defendant and public is necessary.

### 4. A Substantial Sentence Would Be Consistent With Similar Cases in This District

Rogas contends that a downward variance to a 24-month sentence is appropriate because others judges in this District have imposed sentences below the applicable Guidelines ranges. However, the underlying conduct in the cases he relies on for that argument are substantially different from the conduct in the instant case. For example, Rogas cites to a series of insider trading cases (e.g., *United States v. Collins*, 18 Cr. 567 (VSB); *United States v. Blaszczak*, 17 Cr. 357 (LAK)) which, although quite serious, do not involve direct financial harm to other individuals, as compared with the defendant who fraudulently induced investors to provide him with over $123 million. Other cases that Rogas cites to involved losses far less severe than what he caused in this case (e.g., *United States v. Newkirk,* 14 Cr. 534 (JSR), where the defendant fraudulently induced lenders to provide money towards the purchase of Maxim magazine and where the lenders lost a total of $8 million; *United States v. Thompson*, 19 Cr. 698 (ER), where the victim losses totaled approximately $3 million; *United States v. Gata-Aura*, 18 Cr. 759 (JSR), where the victim losses totaled approximately $40 million); and *United States v. Petit*, 19 Cr. 850 (JSR), an accounting fraud case)).[4]

It is, of course, no surprise that there have been judges in this District that have imposed sentences below the applicable Guidelines ranges in appropriate cases. It is also true that defendants in investor fraud cases in this District have received substantial terms of imprisonment, including recent cases such as *United States v. Jaramillo*, 17 Cr. 004 (LTS) (144-

---

[3] The family and medical concerns raised in Rogas's sentencing submission are unfortunate, but those concerns were well known to Rogas at the time he committed his crimes. In addition, it appears that the Rogas has an extended network of family and friends, including numerous individuals who wrote letters appended to Rogas's sentencing submission, who could be a supportive network for Rogas's wife and children.

[4] Rogas also points to two other cases, *United States v Gaffey*, 18 Cr. 693 (RMB), a tax fraud case; and *United States v. Atilla*, 15 Cr. 867 (RMB), a sanctions evasion case, in support of this argument. These two cases are even farther afield from the instant case.

month sentence for an investor fraud involving approximately $1.2 million in losses); *United States v. Moore*, 18 Cr. 759 (RMB) (140-month sentence for an investor fraud involving $57 million in losses); *United States v. Sadleir*, 20 Cr. 320 (PAE) (72-month sentence for an investor fraud involving approximately $32 million in losses); *United States v. Qin*, 21 Cr. 75 (VEC) (90-month sentence for an investor fraud); *United States v. Hu*, 20 Cr. 360 (AKH) (144-month sentence for an investment advisor who ran a $120 million Ponzi scheme); and *United States v. Ruiz*, 21 Cr. 695 (VSB) (72-month sentence for an investment adviser who ran a $10 million Ponzi scheme).

In short, given the ample precedent for serious cases such as this one, it would not be disproportionate to impose a sentence at the low end of the Guidelines range here. This is not a case where the loss amount if hypothetical or where there was no actual loss. Actual victims suffered over $123 million in actual loss, all because of the defendant.

### Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence near the bottom of the Guidelines range of 121 to 151 months' imprisonment is appropriate in this case.[5]

    Respectfully submitted,

    DAMIAN WILLIAMS
    United States Attorney

By:     /s/
    Richard Cooper / Jared Lenow
    Assistant United States Attorneys
    (212) 637-1027 / -1068

cc:

William M. Sullivan, Jr., Esq. (by ECF)
Thomas C. Hill, Esq. (by ECF)

---

[5] The Government is working to resolve certain forfeiture and restitution issues, and will provide an update to the Court prior to sentencing.